UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INDUSTRIAL QUICK SEARCH, INC.,
MICHAEL MEIRESONNE, and MEIRESONNE &
ASSOCIATES,

                              Plaintiffs,

            – against –

MILLER, ROSADO & ALGOIS, LLP, CHRIS
ROSADO, and NEIL A. MILLER, ESQ.,

                              Defendants.[1]

**OPINION AND ORDER**
13 Civ. 5589 (ER)

RAMOS, D.J.:

        In this diversity case, Industrial Quick Search, Inc., Michael Meiresonne, and Meiresonne

& Associates (collectively, "Plaintiffs" or "IQS") accuse Chris Rosado, Neil Miller, and their

law firm Miller, Rosado & Algois, LLP (collectively, "Defendants") of legal malpractice and

breach of contract, arising under the law of the State of New York.  Complaint ("Compl."), Doc.

1 ¶ 1.  Specifically, Plaintiffs contend that Defendants committed numerous negligent acts in

their representation of Plaintiffs in an underlying copyright infringement action brought by

Thomas Publishing Company ("Thomas Publishing") and the Product Information Network, Inc.

("PINI") (collectively, "Thomas"), and that in doing so Defendants breached their contractual

obligations to render competent and professional legal services as required by their retainer

agreement.  *Id.* ¶¶ 110–18.

        In the underlying action (the "Thomas Action"), Judge Robert Owen of the Southern

District of New York entered default judgment against IQS, finding that they had

---

[1] The Clerk of Court is respectfully directed to amend the caption as set forth above.

misappropriated and plagiarized materials copyrighted by Thomas, and deliberately destroyed documents central to determining the scope of their violation.[2]  Owen Findings of Fact and Conclusions of Law ("Owen Findings"), dated August 2, 2006, Doc. 65, Ex. E at 12, ¶¶ 20–21. As a result, IQS settled with Thomas for $2.5 million.  Compl. ¶ 66.  IQS then brought the instant action, suing their attorneys,[3] asserting that but for Defendants' negligence, Judge Owen would not have entered default judgment against them and they would not have had to pay Thomas $2.5 million to settle the underlying case.  Before the Court are the parties' cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure: Plaintiffs seek partial summary judgment as to their malpractice claim, *see* Plaintiffs' Memorandum in Support of Partial Summary Judgment ("Pls.' Mem. in Supp."), Doc. 57, Attach. 3, and Defendants seek summary judgment on both the malpractice and breach of contract claims, as well as claims against Chris Rosado in his individual capacity, Defendants' Memorandum in Support of Summary Judgment ("Defs.' Mem. in Supp."), Doc. 65, Attach. 8. For the reasons set forth below, Plaintiffs' motion for partial summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

---

[2] The Thomas Action is docketed as *Thomas Publishing, et al v. Industrial Quick, et al*, 02 Civ. 3307 (RO).

[3] The instant action was originally filed in the United States District Court for the Eastern District of New York in 2009.  *See Industrial Quick Search, Inc. et al v. Miller, Rosado & Algois, LLP et al.*, 09 Civ. 1340 (SLT) (JO).  The matter was transferred to this District after discovery and briefing on the cross-motions for summary judgment were complete.

# I.     FACTUAL AND PROCEDURAL BACKGROUND[4]

## A.  The Thomas Action

Thomas Publishing is a New York Corporation that publishes the copyright-protected publication known as the Thomas Register of American Manufacturers (the "Thomas Register"). The Thomas Register provides a directory containing listings and descriptions of products, services, companies and executives in the manufacturing industry. Owen Findings at 1, ¶ 2. It is available online, in print, and on CD and DVD. *Id.* Thomas Publishing generates revenue by selling advertising in its publications to manufacturers and other industrial companies. *Id.* PINI is a Delaware corporation which, under license from Thomas Publishing, contracts with independent sales managers to market and sell advertising for the Thomas Register. *Id.* at 2, ¶¶ 3–4.

Plaintiff Meiresonne & Associates ("M&A"), an Illinois corporation that is owned and operated by Plaintiff Meiresonne, is one such independent sales manager that PINI contracted

---

[4] Defendants object to Plaintiffs' Rule 56.1 Statement as improper because it either lacks citation, relies on Plaintiffs' prior unsupported assertions, which are not competent evidence, or relies on citations that do not in fact support the proposition advanced. Defendants' Response to Rule 56.1 Statement of Undisputed Material Facts ("Defs.' Resp. to 56.1"), Doc. 28 at 1. Defendants therefore ask the Court to disregard Plaintiffs' 56.1 Statement.

Pursuant to Federal Rule of Civil Procedure Rule 56(c)(1)(A) and Local Rule 56.1(d), the Court will not consider statements in Plaintiffs' 56.1 Statement that do not cite to any admissible evidence in the record. *Shkreli v. JPMorgan Chase Bank, N.A.*, No. 13 Civ. 5647 (LGS), 2015 WL 1408840, at *1 n.1 (S.D.N.Y. Mar. 27, 2015) (declining to consider paragraphs from plaintiff's 56.1 statement that were not supported by citation to evidence in record) (citing *Shepard v. Frontier Commc'ns Servs., Inc.*, 92 F. Supp. 2d 279, 284 (S.D.N.Y. 2000)). Plaintiffs' reliance on unsupported assertions in their 56.1 are legion. *See generally* Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts ("Pls.' 56.1"), Doc. 27. But just by way of example, Plaintiffs assert that "Defendant counsel stipulated to his own clients' alleged acts without first consulting Plaintiff clients, so as to limit his own liability," but offers no support for this assertion. Pls.' 56.1 ¶ 139.

Likewise, the Court will not consider disputed statements in Defendants' 56.1 Statement to which Plaintiffs objected or denied but failed to provide a specific citation to admissible evidence as required by Local Rule 56.1(d). *See Feis v. United States*, 394 F. App'x 797, 799–800 (2d Cir. 2010) (affirming district court's declination to "consider as disputed any statement supported by admissible evidence to which Plaintiff objects, *but does not support with evidence* . . . [as] in perfect accordance with Local Rule 56.1(d)") (internal citations omitted, emphasis in original); *see also* Local Rule 56.1(d) (requiring that "each statement controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)"). For example, in Plaintiffs' Response to Defendants' Rule 56.1 Statement of Undisputed Material Facts ("Pls.' Resp. to

with to solicit advertising for the Thomas Register. Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts ("Pls.' 56.1"), Doc. 27, ¶¶ 6–7; Owen Findings at 2, ¶ 4. In this capacity, M&A and Meiresonne were privy to Thomas Publishing's confidential and proprietary information, which had been entrusted to Meiresonne by PINI for use in recruiting advertisers to Thomas Publishing. *See* Thomas Publishing Memorandum of Law in Support of Motion to Strike, Doc. 59, Ex. Q, at 5. M&A worked under contract with PINI as an independent sales manager on a commission basis for over six years, from 1996 to 2002. *See* Owen Findings at 2, ¶ 4; Spoliation Tr. 19:7–9; Compl. ¶ 57(e).

---

56.1"), Doc. 29, Plaintiffs deny that "Chris Terryn was . . . an employee of IQS." Pls.' Resp. to 56.1 ¶ 20. Not only is this statement unsupported by citation to the record, it is controverted by Plaintiffs' own submissions. *See* Meiresonne Aff. ¶ 17 (stating that Terryn was "an individual . . . employed as an intern with IQS [and] whose employment lasted a total of 100 hours in April and May of 2001"); Meiresonne 2010 Dep. Tr. Dec. 10, 2010, Doc. 25, Ex. G at 75:19–24, 77:13–14 (same); Compl. ¶ 18 (same). With these conclusions in mind, and in an effort to present a coherent background section, the Court relies on the parties' supported Statements of Undisputed Material Facts, supported responses, and their supporting submissions, in particular, Judge Owen's Findings.

Finally, the Court notes that the overwhelming majority of Plaintiffs' memoranda of law and expert reports, do not contain a single citation to the record. Instead, Plaintiffs' briefs provide a recitation of legal standards, no application of those standards to the facts of this case, and only general references to their supporting 56.1 Statement, affidavits, and expert reports. *See e.g.*, Pls.' Mem. in Supp. at 1 (demonstrating extent of Plaintiffs' analysis consists of: "Plaintiff demonstrates each of these elements in this motion. As set forth in the 56.1 statement, and supported by the affidavit of Michael Meiresonne, the deposition transcripts of defendants Neil Miller, Esq. and Chris Rosado, Esq. each of the elements is shown. There is no doubt that the defendants represented plaintiffs in the underlying matter of *Thomas v. Industrial Quick Search, Inc.* . . . The affidavit of Oscar Michelen, Esq, offered in favor of Plaintiff[s], demonstrates that [D]efendants departed from good and accepted practice . . . ."). Plaintiffs' expert, in turn, also provides no citation to the record. *See* Michelen Report in Support of Motion for Partial Summary Judgment ("Michelen Rep."), Doc. 57, Ex. 4, Part A at 7 (asserting without citation: "Archives.org was discussed among the parties, but no such argument was presented to the court."). In addition, unlike the usual attorney affirmations which merely attach copies of documents alleged to be relevant and admissible, and identifies those documents for the Court, Plaintiff's counsel submitted an affirmation which includes arguments and factual assertions. *See* Affidavit of Andrew Lavoott Bluestone ("Bluestone Aff."), Doc. 57. The affirmation is patently improper in that he could not possibly have personal knowledge of the matters discussed, as evidenced by the fact that the affirmation—unlike much of counsel's other submissions—actually contains citations to the record, *see, e.g.*, Bluestone Aff. ¶¶ 8–10, 90–100, 170–175; *see also Little v. City of New York*, 487 F.Supp.2d 426, 433 n. 2 (S.D.N.Y. 2007) ("The law is clear that an attorney's affirmation that is not based on personal knowledge of the relevant facts is to be accorded no weight on a motion for summary judgment."). Although the court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the Court's attention, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001), the net result of Plaintiffs' counsel's deficiencies has been to impose on the Court and its limited resources the burden of parsing the entirety of the voluminous record in the instant case to ensure that his client's claims receive thorough and just consideration.

Plaintiff Industrial Quick Search, Inc. ("IQS") is a Michigan corporation that was formed in 2000 and went online in 2001. Meiresonne Affidavit ("Meiresonne Aff."), Doc. 57, Attach. 2 ¶¶ 36–37. Meiresonne is a principal and investor in IQS. Compl. ¶ 7; Transcript of Spoliation Hearing ("Spoliation Tr."), Doc. 65, Ex. A at 145:24–25. Like the Thomas Register, IQS operates a web-based directory—www.industrialquicksearch.com—that provides customers with a listing of industrial products and services, and charges manufacturers seeking to advertise such products and services a fee for inclusion on the web-based directory. Compl. ¶ 5. In this sense, IQS is a direct competitor of Thomas Publishing. Unlike the Thomas Register, the website is organized into "vertical websites." This means that IQS's website acts as a central homepage that provides customers with links to other websites concerning particular products or services, for example: www.lubricatingsystems.com, or www.deburringmachinery.com. Owen Findings at 2, ¶ 5. By organizing the website in this way, IQS hoped to provide advertisers with high rankings for their products and services on internet search engines in a way that Thomas Publishing at that time could not. Meiresonne Aff. ¶¶ 29–30. Indeed, Meiresonne conceived of IQS precisely to capitalize on this issue, which Thomas Publishing's advertisers had brought to his attention. *Id.* ¶¶ 31–32. As he plainly admits, and as discussed more fully below, Meiresonne endeavored to keep Thomas Publishing from knowing about his relationship with IQS. Spoliation Tr. at 146:1–3.

In the Spring of 2001, as IQS rolled out its website, it hired Christopher Terryn, a student at Grand Valley State University in Michigan, as an intern. Pls.' 56.1 ¶ 20; Owen Findings at 3, ¶ 7. Terryn worked for IQS only briefly, from April to May of 2001. While employed there, Terryn was instructed by Meiresonne and IQS office manager Nicole Korthals to copy material

from the Thomas Register for use on the IQS website. *Id.* at 3, ¶¶ 7–10.[5] Terryn was also instructed to use Thomas Publishing's proprietary program ThomAds, which provides a listing of companies that advertise with Thomas Publishing and the amount of money they spend on advertising, "to determine the order in which advertisers would appear on IQS's vertical websites." *Id.* ¶¶ 9–10; *see* Thomas Publishing Memorandum of Law in Support of Motion to Strike, Doc. 59, Ex. Q, at 10.

Several months following his employment with IQS, in October 2001, Terryn informed Thomas Publishing that IQS had extensively copied the Thomas Register in developing its website. Owen Findings at 3, ¶ 13. In response, on November 6, 2001, attorneys for Thomas sent IQS a cease-and-desist letter, informing IQS that it had "inspected IQS's website and discovered that a great number of product headings on the website were taken directly from The Thomas Register." Cease-and-Desist Letter, Doc. 25, Ex. C at 1; Defendants' Rule 56.1 Statement of Undisputed Material Facts ("Defs.' 56.1) ¶ 10. The letter further stated that "[m]any of these product headings are unique and distinctive, making any claim of independent creation by your company implausible. Furthermore, descriptive text listed under IQS's product headings were also copied verbatim from The Thomas Register." *Id.* Thomas therefore instructed IQS that "continued use of Thomas's original and copyrighted product headings and

---

[5] IQS and Meiresonne dispute that Terryn did this at their instruction. Meiresonne Aff. ¶¶ 40–58. But this is largely irrelevant to the issue of spoliation, and the merits of the underlying copyright case are not before the Court. In any event, the Court notes that, in 2010, the Michigan Court of Appeals affirmed the dismissal of Plaintiffs' lawsuit for indemnification and contribution against Terryn for allegedly defaming Plaintiffs by falsely informing Thomas Publishing "that his plagiarism had occurred at the direction of IQS." Michigan Court of Appeals Decision, February 11, 2010, Doc. 62, Ex. C, at 2. In rejecting Plaintiffs' claims, the court noted that "[i]t cannot be seriously maintained that Terryn, a part-time intern for the limited period of two months employment, could be more culpable than plaintiffs who initiated the illegal copying of [the Thomas Register] a month before Terryn was formally engaged." *Id.* at 5. This conclusion is consistent with the Thomas Publishing study, discussed *infra* at 7–8, which concluded that as of March 2001—the month prior to Terryn's hire—IQS's website reflected significant copying of the Thomas Register.

descriptive text [would] constitute knowing and willful copyright infringement and unfair competition." *Id.*

On November 20, 2001, IQS's then-counsel, Price, Heneveld, Cooper, DeWitt & Litton, responded by letter stating that "[w]hile we disagree with your infringement allegations, in order to avoid further dispute, . . . the descriptive text on each [IQS] Web-page was being rewritten for other reasons even prior to receiving [Thomas Publishing's] letter" and that the "rewriting is scheduled to be completed by mid January 2002." Response to Cease-and-Desist Letter, Doc. 25, Ex. D at 1; Defs.' 56.1 ¶ 11. IQS rewrote portions of the descriptive text on its websites that were alleged to have been copied from the Thomas Register. *Id.* ¶ 11; Owen Findings ¶ 15. As part of that process, IQS employees were instructed to ensure that the descriptive text on IQS's website was different from the text contained in the Thomas Register. Owen Findings at 4, ¶ 15. According to Meiresonne, any documentation related to the re-writes—"including the sources that had been used by Terryn to originally create the web sites"—was "discarded in the normal course of business." Meiresonne Aff. ¶¶ 77, 80.

At the time the cease-and-desist letter was sent to IQS, Thomas Publishing was not aware that Meiresonne and its independent sales manager, M&A, had any affiliation with IQS. Defs.' 56.1 ¶ 14; Owen Findings ¶ 16. Meiresonne kept his relationship with IQS hidden from Thomas by using false names when calling potential advertisers on behalf of IQS and using a different address for IQS-related matters. *Id.*; Spoliation Tr. at 146:1–3. A few months later, however, Thomas Publishing discovered Meiresonne's relationship with IQS. Defs.' 56.1 ¶ 14; Owen Findings ¶ 18.

In April 2002, Thomas Publishing conducted a study comparing the text descriptions of companies included in the print volumes of the 1999-2002 editions of the Thomas Register

against the descriptions of the same companies listed on IQS's website. Defs.' 56.1 ¶ 21; Owen

Findings at 5, ¶ 20. They discovered that, at least as of March 22, 2001, before Terryn was even

hired, IQS's website contained 350 listings for manufacturers and service providers that also

appeared in the Thomas Register, and that approximately 82% of those contained product

descriptions virtually identical to those appearing in the Thomas Register. *Id.*

Accordingly, on April 30, 2002, Thomas sued Plaintiffs in the Southern District of New

York alleging that they knowingly and willfully copied content from the Thomas Register to

create IQS's website in violation of copyright laws. Pls.' 56.1 ¶ 14; Defs.' Resp. to 56.1 ¶ 14.

Thomas also alleged unfair competition based on the inclusion in IQS's website of certain of

Thomas's confidential and proprietary marketing information. *Id.* ¶ 19; Defs.' Resp. to 56.1 ¶

19.

**Defendants' Representation of Plaintiffs**

On January 28, 2003, by execution of a retainer agreement (the "Retainer Agreement")

and payment of $25,000, Plaintiffs retained Defendant Miller, Rosado & Algois ("MRA"), a law

firm with offices in the Eastern District of New York, to represent them in connection with the

Thomas Action. Pls.' 56.1 ¶¶ 11, 29; Defs.' Resp. to 56.1 ¶¶ 11, 29; Defs.' 56.1 ¶ 17. The

parties dispute the extent of Defendant Rosado's involvement in the case. Defendants contend

that Rosado was only the primary client "contact" with "billing responsibility" for the matter,

and that Defendant Miller had primary responsibility for the matter. *See* Rosado Deposition

("Rosado Dep."), Doc. 61, at 33:5–7; Miller Deposition ("Miller Dep."), Doc. 61, Ex. 2 at

30:20–31:3; Rosado Affidavit ("Rosado Aff."), Doc. 62 Attach. 2, ¶ 9. Plaintiffs, in contrast,

assert that Rosado had greater involvement in the case, and note that it was Rosado who signed

the Retainer Agreement which stated that "[he] w[ould] have primary responsibility for

[Plaintiffs'] representation." Pls.' 56.1 ¶ 30; Meiresonne Aff. ¶ 27; Rosado Dep. at 33:16–25; Miller Dep. at 28:17–19; Retainer Agreement, Doc. 58, Ex. C at 3, 5. Rosado also asserts that he issued an "oral litigation hold" at the parties' initial meeting in early 2003, but Plaintiffs deny that this occurred. Rosado Dep. at 38:6–25; Meiresonne Aff. ¶¶ 106–07.

Discovery in the Thomas Action commenced in April 2003, with requests for document production being served on IQS thereafter. *See Thomas Publishing, et al v. Industrial Quick, et al*, 02 Civ. 03307 (RO), Docs. 26, 28–29. Thomas requested documents relating to the creation of the IQS websites in 2001 and early 2002 and the use of proprietary Thomas selling aids, among other things. Owen Findings at 6, ¶ 25. As part of discovery, between August 4–6, 2003, counsel for Thomas reviewed documents at IQS's offices in Grand Rapids, Michigan. Owen Findings at 8, ¶ 36; Miller Affidavit ("Miller Aff."), Doc. 62 ¶ 7. What occurred during the pendency of discovery is hotly disputed by the parties to the instant action.

According to Meiresonne, he "repeatedly asked Defendant attorneys for legal advice as to how to prepare and respond to the Thomas [P]laintiffs' broad discovery request[s]," including "advice on the retention, storage, production of, or permissible discarding of non-responsive information," among other things. Meiresonne Aff. ¶¶ 92–95. But, Meiresonne asserts, "no advice was ever given to [him]" with respect to these topics. *Id.* ¶ 96. Meiresonne further avers that Defendant Miller was on trial in another matter at the time of the production and that Defendants "refused" to provide legal advice, answer questions, or "appear in person for the document production." *Id.* ¶¶ 98–100. As a result, Plaintiffs claim that no document production procedures or controls, privilege log, Bates stamping, "or other means of tracking documents" were established, and Thomas was permitted to remove approximately 30,000 un-inventoried documents from IQS's offices. *Id.* ¶¶ 101–103, 116.

Meiresonne further avers that in the days prior to the August document production, IQS "t[ook] actions to remove files that they believed were not responsive to [the] Thomas [P]laintiffs' discovery requests" because they believed it would be "helpful to avoid junk papers in the production." *Id.* ¶ 109. By way of example, Meiresonne explained that M&A had a cost-saving practice of reusing paper for which only one side had been used for printing. *Id.* ¶ 88. Consequently, some re-used papers had personal, financial and other confidential information on one side, and information responsive to Thomas's requests on the other. *Id.* ¶ 90. Specifically, Plaintiffs "removed and discarded: (a) documents printed on recycled scrap paper, with sensitive and non-responsive financial and other data printed on the scrap side," but only after making copies of any relevant non-personal information for production; "(b) documents relating to [IQS's] 're-rank' efforts;" "(c) documents relating to [IQS's] company listing and product descriptive matter 're-writes' that occurred after the alleged infringement had ceased." *Id.* ¶¶ 110–112. According to Meiresonne, after IQS "had removed and discarded [the] documents . . ., but before the documents were taken away for permanent disposal by [their] trash service," he "sent one final inquiry" to his attorneys informing them what IQS had done and "request[ing] direction as to whether or not such actions were proper," but received no response from Defendants. *Id.* ¶¶ 113–114.

Defendants, on the other hand, contend that Meiresonne was fully aware that Miller would not be present at the document production. Miller avers that he "advised [Meiresonne] that [he] would be engaged in a trial on another matter during the week of the production" and sought to "open a dialogue as to whether the production should be adjourned." Miller Aff. ¶ 8. Miller further maintains that "Meiresonne specifically directed that neither [Miller], nor anyone from [Miller, Rosado & Algois], attend the production because [Meiresonne] did not want to

incur the cost of an attorney travelling . . . to Michigan." *Id.* According to Miller, his presence

was not critical to the meeting because he had previously discussed with Meiresonne which

documents were responsive to Thomas's demands. *Id.* ¶¶ 7–8. Among these documents were

"advertiser files," which contained information regarding companies that advertised with IQS.

Although Miller did not conduct a review of each document, he asserts that he and Meiresonne

had agreed to make the entire file available to Thomas. *Id.* ¶¶ 9–10. Finally, Miller asserts that

he was "never informed by Mr. Meiresonne, or anyone else, that Plaintiffs were planning on

discarding any documents, or that they had in fact discarded documents prior to the document

production." *Id.* ¶ 11.

Depositions in the Thomas Action commenced in the fall of 2003. At Meiresonne's

October 10, 2003 deposition he admitted that he knew back in October 2001—prior to receipt of

the cease-and-desist letter from Thomas—that there was a "possibility" that IQS had copied

information from the Thomas Register for inclusion on the IQS website. Owen Findings at 5, ¶

22 (citing Meiresonne October 2003 Deposition Tr. at 24–31); Spoliation Tr. 157–165:24.

On November 21, 2003, Lisa Dokter, a former IQS editorial staff member, contacted

counsel for Thomas to inform them that she and her IQS colleagues, at Meiresonne's direction,

removed relevant documents from IQS's files in the days prior to the August 2003 document

production so that Meiresonne could destroy them. Owen Findings at 6–7, ¶¶ 28–33.

Subsequently, on November 24, 2003, Dokter submitted a declaration more specifically setting

forth that the documents removed from the IQS's files included:

> (l) documents relating to the creation of IQS's vertical websites in
> 2001 and early 2002, including, but not limited to, the copying of
> the [Thomas Register's] online information for inclusion on IQS's
> websites; (2) documents relating to IQS's unauthorized use of [the

> Thomas Register's] selling aids, including, but not limited to, Thom[A]ds:, Thomas's Prospecting CD, and Who's Who in the TR Sales Force; (3) documents that contained instructions concerning the purification/cleansing of IQS's vertical websites; (4) documents reflecting the re-ranking of IQS's advertisers based upon information obtained from [the Thomas Register's] sources; and (5) IQS internal memoranda and correspondence concerning any of the foregoing.

Declaration of Lisa J. Dokter, Doc. 59, Ex. K ¶ 10.[6]

Based on the foregoing, on November 24, 2003, Thomas moved the Court for an order to show cause pursuant to Rule 37, to strike IQS's answer, third-party claims, counterclaims, and reply to counterclaims on the basis that IQS had intentionally destroyed relevant discovery. Meiresonne Aff. ¶ 120. According to Meiresonne, it was only in December 2003, the month after the Rule 37 motion was filed and five months after the August document production, that Defendants instructed them not to destroy any potentially relevant information. Meiresonne Aff. ¶ 106.

At some point between the Fall of 2003 and the Spring of 2004, Nicole Parker, a then-employee of IQS, prepared a report (the "Parker Report") concluding that in 2001 almost 50% of IQS's product listings contained the "exact wording" or "very similar" wording to language contained in the Thomas Register. *Id.* at 207:2–13; Owen Findings ¶ 23; Meiresonne Aff. ¶ 130–32.

A spoliation hearing was held before Judge Owen between February 14–16, 2006. Defs.' 56.1 ¶ 25; *see generally* Spoliation Tr. As relevant here, neither party called Terryn during the

---

[6] As mentioned above, "ThomAds" is Thomas Publishing's proprietary and confidential selling aid, which consolidates information on the companies that advertise in the Thomas Register, including the dollar amount those companies spend on advertising. *See* Thomas Publishing Memorandum of Law in Support of Motion to Strike, Doc. 59, Ex. Q, at 10. "Who's Who in the TR Sales Force" is "a confidential national directory of personnel [who work] in [Thomas Publishing's] sales force. *Id.* at 5.

spoliation hearing.  Rather, the parties relied on Terryn's January 2004 deposition testimony, with counsel for Thomas reading significant excerpts into the record over Defendants' objections.  Spoliation Tr. 26:6–67:25.  IQS's counsel, Defendant Miller, also read excerpts of Terryn's deposition testimony into the record.  *Id.* at 68:1–80:4.  In particular, Miller focused on the fact that Terryn had reached an agreement with counsel for Thomas under which they would represent him should any legal action result from filing his affidavit or deposition testimony.  *Id.* at 69:9–24.  Miller also read those portions of the deposition transcript in which he pressed Terryn on his precise recollection of conversations with IQS staff regarding IQS's alleged practices and instructions related to the creation and maintenance of its website.  *See e.g.*, *id.* at 74:16–79:80.

At the spoliation hearing, Meiresonne was examined about the conversations he had with counsel regarding their preparation for the 2003 document production.  Miller Aff. ¶ 13.  Although Miller objected to the question, asserting attorney-client privilege, Judge Owen warned that a negative inference could be drawn from Meiresonne's refusal to testify on that issue.  *See* Spoliation Tr., at 180:22–181:13.  Following consultation with counsel, Meiresonne ultimately testified that he unilaterally determined the scope of the Thomas Plaintiff's document requests.  *Id.* at 181:20–183.

Meiresonne was also examined about a statement in his June 2002 affidavit in which he said that he was "confident that IQS could prove that it did not copy any of [P]laintiffs' works."  Spoliation Tr. at 206:22–207:4.  Counsel for Thomas noted that one year after Meiresonne swore to that affidavit, at his October 2003 deposition, Meiresonne had stated that he knew, in 2001, that there was a "possibility" that IQS copied the Thomas Register in creating IQS's website.  Owens Findings ¶ 22; Spoliation Tr. 157–165:24.  This revelation prompted considerable

questioning from Judge Owen, leaving him to comment that Meiresonne's apparent contradiction left him "distressed." Spoliation Tr. 162:10. Finally, Meiresonne conceded that he used a different address to "disguise" his connection with IQS from Thomas Publishing. Spoliation Tr. at 146:1–3.

Following the spoliation hearing, on August 2, 2006, Judge Owen issued his Findings of Fact and Conclusions of Law. In short, Judge Owen found that in 2001 Plaintiffs created IQS's vertical websites by copying information from the Thomas Register, used ThomAds to rank advertisers based on their advertising expenditures with Thomas Publishing, and then destroyed information relevant to the site's creation, all the while attempting to hide Meiresonne's relationship with IQS from Thomas. Owen Findings at 3, ¶¶ 10, 12, at 6, ¶ 24; Defs.' 56.1 ¶ 27. He also found that in the Summer of 2003, after the commencement of the Thomas Action, Meiresonne destroyed documents responsive to Thomas's discovery requests that would have assisted in determining the scope of IQS's copyright infringement and misappropriation of confidential material. Owen Findings at 6–7, ¶¶ 30–36. Judge Owen further concluded that Meiresonne's October 2003 deposition testimony acknowledging that he understood in October 2001 that there was a "possibility" that IQS had copied information from the Thomas Register, "directly contradicted Meiresonne's June 2002 sworn affidavit" in which Meiresonne averred that "IQS did not copy [Thomas Publishing's] material or text" in creating the IQS website and that "IQS [was] confident that it can prove that it did not copy any [such] works." *Id.* at 5, ¶¶ 21–22. Based on these factual findings, Judge Owen concluded that IQS had "intentionally destroyed the documents at issue," and that the "destroyed documents were likely critical to determining the scope of . . . . [their] copyright infringement and . . . misappropriation of [Thomas'] confidential information." *Id.* at 10, ¶ 11, at 12, ¶20. Judge Owen therefore struck

IQS's answer, third-party claims and counterclaims, and reply and entered default judgement on liability against them on all of Thomas's allegations. *Id.* at 12, ¶ 21. Judge Owen also ordered a hearing on damages be held on September 11, 2006, but the parties settled just prior to the hearing, with IQS paying Thomas $2.5 million. Defs.' 56.1 ¶ 40; Compl. ¶ 66.

According to Meiresonne, it was not until January 18, 2007, over three years after the document production, that counsel first mentioned that IQS should have a formal document retention policy in place. Meiresonne Aff. ¶ 107. In September 2007, counsel's representation of IQS terminated. Pls.' 56.1 ¶ 28; Compl. ¶¶ 66–67.

### B. The Instant Litigation

On March 31, 2009, Plaintiffs initiated the instant litigation against Defendants, asserting claims of malpractice and breach of contract. Compl. ¶ 1. Plaintiffs principally allege that Defendants negligently failed to render competent legal services by failing to properly advise them on the law governing document preservation, to adequately supervise document production, or offer an adequate defense at the spoliation hearing. *Id.* ¶¶ 80–109. Plaintiffs claim that these failures also provide a basis for their breach of contract claim because of the Retainer Agreement between the parties. *Id.* ¶¶ 110–118. They therefore seek reimbursement of the $2.5 million paid to settle the Thomas Action as well as damages in an amount to be determined by the Court. *Id.* ¶ 118.

The parties conducted discovery in the instant case in the Fall and Winter of 2010. As part of discovery, Meiresonne was deposed on December 10, 2010. During his deposition, Meiresonne confirmed that Terryn copied from the Thomas Register in 2001, when Defendants were not their counsel. D's 56.1 ¶ 20; Meiresonne 2010 Dep. Tr. Dec. 10, 2010 at 75-77, Doc. 25, Ex. G. Meiresonne also admitted that he never discussed with Miller or Rosado whether he

should have destroyed documents in 2003 and, furthermore, never advised Defendants that he planned to do so.[7]  D's 56.1 ¶¶ 34–35; Meiresonne 2010 Dep. Tr., dated December 10, 2010 at 150:17–25, 121:14–18.

At Rosado's deposition, he testified that he issued an "oral litigation hold" at the parties' initial meeting in early 2003.  Rosado Declaration in Opposition ("Rosado Opp. Dec."), Doc. 62, Ex. 2 ¶ 7; Rosado Dep. at 38:6–25 (noting that he "believe[d]" he had discussions about document preservation in the parties' "initial meeting").  Rosado also acknowledged authoring a March 27, 2003 email in which he informed Meiresonne that they would "discuss a discovery strategy in the very near future."  Rosado Dep. at 36:11–37:25.  In his declaration, Miller averred that, although he did not conduct a "page by page review" of the discovery documents, he "had discussions with Mr. Meiresonne regarding what documents he had that were responsive to Thomas' document demands."  Miller Decl. ¶¶ 8–10.

## II.    LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F.Supp.2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.

---

[7] In apparent conflict, Meiresonne avers in his 2011 affidavit in the instant action that he had specifically informed Defendants that he destroyed documents prior to the August document production and inquired as to the propriety of his actions, but received no response from Defendants.  Meiresonne Aff. ¶¶ 113–14.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F.Supp.2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F.Supp.2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cty.*, 661 F.3d 128, 139 (2d Cir. 2011)); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.") (citation omitted). The

Court is not required to resolve the case on summary judgment merely because all parties move for summary judgment. *Morales*, 249 F.3d at 121.

### B. Standard for Legal Malpractice

In a diversity action based on attorney malpractice, state substantive law applies. *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008). Here, that is the law of New York. To prove such a claim, "a plaintiff must demonstrate [1] 'that the attorney was negligent, [2] that the negligence was the proximate cause of the injury and [3] that [the plaintiff] suffered actual and ascertainable damages.'" *Henkel v. Wagner*, 553 F. App'x 106, 107 (2d Cir. 2014) (quoting *Rubens*, 527 F.3d at 254–55 (2d Cir. 2008)).

To satisfy the negligence prong, the plaintiff must show that the attorney's conduct "fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of his profession." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (quoting *Grago v. Robertson*, 370 N.Y.S.2d 255 (1975)); *see also McCoy v. Feinman*, 99 N.Y.2d 295, 301 (2002). "Expert testimony is sometimes required to establish the standard of care in the legal profession, whether the defendant-attorney failed to comply with that standard, and whether the negligence proximately caused any injury to the plaintiff-client. Yet, expert testimony may be deemed unnecessary where the ordinary experience of the fact finder provides sufficient basis for judging the adequacy of the professional service." *Stonewell Corp. v. Conestoga Title Ins. Co.*, 678 F. Supp. 2d 203, 209 (S.D.N.Y. 2010) (citations and quotation marks omitted). "Allegations that amount to nothing more than a 'dissatisfaction with strategic choices' will not support a malpractice claim as a matter of law." *Id.* (quoting *Bernstein v. Oppenheim & Co., P.C.*, 554 N.Y.S.2d 487, 490 (1990)).

"To establish proximate cause, 'the client must meet a 'case within a case' requirement." *Rubens*, 527 F.3d at 255 (citing *Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc.*, 10 A.D.3d 267, 272 (1st Dep't 2004)). This requires the Court to engage in "a hypothetical re-examination of the events at issue absent the alleged malpractice." *Littman Krooks Roth Ball, P.C. v. N.J. Sports Prod., Inc.*, No. 00 Civ. 9419 (NRB), 2001 WL 963949, at *3 (S.D.N.Y. Aug. 22, 2001) (citing *N.A. Kerson Co. v. Shayne, Dachs, Weiss, Kolbrenner, Levy, et al.*, 59 A.D.2d 551, 553 (2d Dep't 1977) (internal quotations marks omitted)). In other words, "the plaintiff 'must demonstrate that a reasonable fact-finder could conclude that a reasonable fact-finder in the underlying suit would have arrived [at] a different result *but for* the attorney's negligence.'" *Henkel*, 553 F. App'x at 107 (quoting *Rubens*, 527 F.3d at 254–55 (2d Cir. 2008)) (internal citations omitted); *see also Farrell Family Ventures, LLC v. Sekas & Assocs., LLC*, 863 F. Supp. 2d 324, 330 (S.D.N.Y. 2012) ("In order to plead causation adequately, the party must show that but for the attorney's negligence, what would have been a favorable outcome was an unfavorable outcome.") (quotation marks omitted).

To prevail on a motion for summary judgment in a legal malpractice action, the defendant must establish that the plaintiff cannot prove at least one of these essential elements. *See Rubens*, 527 F.3d at 255. "[W]hether malpractice has been committed is normally a factual determination to be made by the jury." *Corley v. Miller*, 133 A.D.2d 732, 735 (2d Dep't 1987).

## III.   DISCUSSION

### A.  Malpractice

#### 1.  Negligence

Plaintiffs assert that Defendants negligently rendered legal services by (i) failing to properly advise Plaintiffs in connection with the 2003[8] discovery process and (ii) in connection with the 2006 spoliation hearing, failing to offer an adequate defense to the claim that Plaintiffs intentionally destroyed documents.  Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment ("Pls.' Mem. in Support"), Doc. 57, Attach. 3 at 2.  The Court addresses each of these claims in turn.

##### a)  Discovery Issues

The parties agree that default judgment was entered against Plaintiffs because Judge Owen concluded that Plaintiffs engaged in the spoliation of evidence central to determining the scope of their copyright infringement and misappropriation of Thomas's confidential materials. Michelen Report in Support of Motion for Partial Summary Judgment ("Michelen Rep."), Doc. 57, Attach. 4 at 9 ("Due to counsel's failure . . . the Court found that IQS had spoliated relevant material that could not be re-created, struck IQS' answer and entered default judgment against IQS.").[9]  Although Plaintiffs' claims are muddled and scattershot, they principally contend that Defendants failed to issue a litigation hold and failed to properly oversee Plaintiff's compliance

---

[8] Defendants expend much energy claiming that they cannot be held liable for spoliation of evidence that occurred in 2001.  Defendants Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Defs.' Mem. in Opp."), Doc. 62. Ex. 4, 6-7; Furgang Affidavit in Opposition ("Furgang Aff. in Opp."), Doc. 62. Ex. 3, ¶¶ 9–18. As Plaintiffs admit, however, they do not seek to hold Defendants liable for actions pre-dating their retention as counsel.  Michelen Affidavit in Reply to Opposition ("Michelen Repl. Aff."), Doc. 64 Ex. 2 ¶¶ 4–5; *see also* Meiresonne 2010 Dep. Tr. Dec. 10, 2010 at 75-77, Doc. 25, Ex. G.

[9] Plaintiffs have failed to paginate the Michelen Report.  For ease of reference, the Court refers to the ECF page number stamped at the top of the page.

with their discovery obligations, including by failing to answer their questions regarding the propriety of destroying certain documents.[10]  The Court concludes that there are genuine issues of fact as to these discovery issues that preclude a grant of summary judgment to either side.

Plaintiffs contend that Defendants failed to issue a litigation hold, inform them that destroying relevant documents was improper, or otherwise monitor IQS's compliance with the discovery requests, and that these failures constitute attorney negligence.  *See* Michelen Rep. at 8–10.  Specifically, Meiresonne avers it was only in December 2003, five months after the document production, that Defendants instructed them not to destroy any documents.  Meiresonne Aff. ¶ 106.  Meiresonne further claims that Plaintiffs "were given absolutely no direction or advice . . . on how to proceed with" the production.  *Id.* ¶¶ 100, 109 (citing *e.g.*, Exhibits X, Y, and Z, which contain emails tending to show Meiresonne asked for guidance with respect to the production but received few responses).  With respect to the destruction of documents prior to the August 2003 document production, Meiresonne asserts that he "repeatedly asked Defendant attorneys for legal advice" related to the "permissible discarding of non-responsive information," "but no advice was *ever* given to [him]" related to the "discarding of documents."  Meiresonne Aff. ¶¶ 92–97.

In response, Defendants advance two arguments, one legal, the other factual.  First, as a legal matter, they contend that they were not negligent because they had no duty to advise Plaintiffs of their obligation to preserve documents.  Defs.' Mem. in Opp. at 7.  Defendants assert that this conclusion follows because they were retained in 2003, well after Plaintiffs were

---

[10] Plaintiffs also claim that Defendants failed to attend the 2003 document production or properly catalogue documents for the production.  *See* Michelen Repl. Aff. ¶ 101.  However, as Defendants note, they do not explain how this failure is relevant to Plaintiffs' destruction of evidence *prior* to the 2003 document production.  Defs.' Mem. in Opp. at 10; Furgang Aff. ¶¶ 27–28.  These facts are therefore irrelevant to the issue of spoliation, which was the basis for the entry of default judgment.

served with a November 2001 cease-and-desist letter putting them on notice of their duty to preserve relevant documents. *Id.* Defendants' claim rests on the premise that attorneys do not owe their clients a duty to institute a litigation hold or oversee compliance with preservation obligations once a client has been made aware of potential litigation. This premise is mistaken.

As Plaintiffs' expert notes, "'the obligation to preserve evidence runs first to counsel, who then has a duty to advise and explain to the client its obligations to retain pertinent documents that may be relevant to the litigation.'" Michelen Rep. at 7 (quoting *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 189 F.R.D. 76, 81 (S.D.N.Y. 1999)); *see also Mosel Vitelic Corp. v. Micron Tech., Inc.*, 162 F. Supp. 2d 307, 311 (D. Del. 2000) (stating that the "affirmative duty to preserve [relevant] material. . . . extends to that party's attorneys"); *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 73 (S.D.N.Y. 1991) ("This obligation [to preserve relevant documents] ran first to counsel, who had a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction.") (citation omitted).

Courts within this Circuit have construed counsel's obligation to include both the "implementation of a 'litigation hold'" as well as "oversee[ing] compliance with the litigation hold, [and] monitoring [the client's] efforts to retain and produce relevant documents." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004); s*ee also Williams v. New York City Transit Auth.*, No. 10 CV 0882 ENV, 2011 WL 5024280, at *4 (E.D.N.Y. Oct. 19, 2011). Accordingly, "[o]nce a 'litigation hold' is in place, a party and [their] counsel must make certain that all sources of potentially relevant information are identified and placed 'on hold.'" *Zimmerman v. Poly Prep Country Day Sch.*, No. 09 CV 4586 FB, 2011 WL 1429221, at *15 (E.D.N.Y. Apr. 13, 2011) (quoting *Zubulake*, 229 F.R.D. at 432). This is not to say that counsel

is always responsible for their client's destruction of documents, but that counsel has an obligation to take reasonable steps to ensure the preservation of relevant information.

Defendants' claim that *Zubulake* "is inapplicable" because it is a sanctions case rather than a legal malpractice case misses the point. *See* Defs.' Mem. in Opp. at 8; Furgang Aff. ¶ 22. By its terms, that "decision addresses counsel's obligation to ensure that relevant information is preserved by giving clear instructions to the client to preserve such information." *Zubulake*, 229 F.R.D. at 424. At prong one of a malpractice inquiry, the question is whether counsel's behavior "fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of his profession." *Achtman*, 464 F.3d at 337. The Court is mindful that Plaintiffs point to no case law expressly holding that an attorney's failure to institute a litigation hold or monitor a client's compliance with that hold constitutes attorney negligence. *See* Defs.' Mem. in Opp. at 9. Nevertheless, the Court concludes that an attorney's failure to fulfill that "obligation" falls below the ordinary and reasonable skill possessed by members of the legal bar. *Cf. Zubulake*, 229 F.R.D. at 432; *Mosel Vitelic Corp.*, 162 F. Supp. 2d at 311; *Telecom Int'l Am., Ltd*, 189 F.R.D. at 81; *Turner*, 142 F.R.D. at 73. This obligation most certainly attaches here, where Defendants were counsel of record at the time of the filing of the second amended complaint and throughout the discovery phase of the Thomas Action. *See Thomas Publishing, et al v. Industrial Quick, et al*, 02 Civ. 03307 (RO), Docs. 21, 26, 28–29 (indicating that second amended complaint was filed on January 27, 2003 and discovery commenced in or around April 2003).

Defendants next contend, as a factual matter, that even though they had no duty to advise Plaintiffs to preserve documents, they did so advise them. As they explain, Rosado issued an "oral litigation hold" at the parties' initial meeting in early 2003, *see* Defs.' Mem. in Opp. at 8; Rosado Declaration in Opposition ("Rosado Opp. Dec."), Doc. 62, Ex. 2 ¶ 7; Rosado Dep. at

38:6–25 (noting that he "believe[d]" he had discussions about document preservation in the

parties' "initial meeting"); 39:2–25, and Miller adequately advised Plaintiffs as to what relevant

and responsive documents were to be produced in connection with the 2003 document

production, *see* Miller Aff. ¶¶ 8–9; Furgang Aff. ¶ 23.  More specifically, Miller avers that

although he did not review the contents of the "advertiser files," he and Meiresonne agreed to

"make the entire file available to Thomas at the document production."  Miller Aff. ¶¶ 9–10.  In

contrast, Plaintiffs assert Defendants failed to provide legal advice on proper discovery

procedures, never instituted any document production protocols, and only advised them to

"creat[e] a formal document retention policy in writing" in January 2007.  Meiresonne Aff. 99–

107.  As such, there are genuine disputes of material fact as to whether Defendants ever issued a

litigation hold or properly oversaw Plaintiffs' compliance with discovery demands.

     Separately, however, the parties also dispute whether Meiresonne ever specifically

inquired about destroying documents.  In his 2011 affidavit, Meiresonne asserts that after he

"had removed and discarded [the] documents  . . ., but before the documents were taken away for

permanent disposal" he "sent one final inquiry" to Defendants informing them what IQS had

done, and "requested direction as to whether or not such actions were proper," but received no

response from Defendants.  Meiresonne Aff. 113–14.  Defendants contend that this claim is

controverted by Meiresonne's prior deposition testimony.  Miller Aff ¶ 11; Defs.' Mem. in Opp.

at 11; Defs.' Mem. in Supp. at 10–11.  The Court agrees.

     When asked during his 2010 deposition about the 2003 spoliation, Meiresonne stated that

the decision to discard the documents was his alone, that he never advised Defendants of his

intent to destroy documents, and never discussed with them the destruction of documents prior to

the production.  D's 56.1 ¶¶ 34–35; Meiresonne 2010 Dep. Tr., dated December 10, 2010 at

150:17–25 ("Q.  And on whose authority did you throw them out? A. Mine.  Q. . . . And did you ever discuss with Mr. Miller or Mr. Rosado throwing them out before you threw them out? A. No."), 121:14–18 ("Q. Did you ever advise [your attorneys] in those three to seven emails, oral conversations, or faxes that you intended to take out any documents. A. No.").  This prior admission cannot be squared with Meiresonne's claim in his 2011 affidavit that he specifically informed Defendants that he had discarded the documents "and requested direction as to whether or not such actions were proper."  Meiresonne Aff. 113.  Meiresonne's subsequent and conflicting affidavit testimony is therefore insufficient to create a genuine dispute of material fact on this narrow issue.  *See Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014) ("The 'sham issue of fact' doctrine 'prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony.'") (quoting *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir.2013) (per curiam)) (emphasis omitted).

On the record before the Court, there is conflicting testimony as to whether (1) Defendants ever issued an "oral litigation hold" at the parties' initial meeting in early 2003, and (2) Defendants properly advised Plaintiffs as to their discovery obligations in connection with the August 2003 document production.  These issues are central to the resolution of this case.  Accordingly, neither party has established that there are no genuine issues of material fact with respect to whether Defendants were negligent in rendering legal services in connection with the 2003 discovery process.  The Court also concludes, however, that there is no genuine dispute as to whether Meiresonne ever specifically informed Defendants of his intent to destroy documents or ever specifically requested advice from Defendants regarding the destruction of documents.  Summary judgment is therefore granted to Defendants on this narrow discovery related dispute.

## b)  *Spoliation Hearing*

Plaintiffs contend that Defendants negligently rendered legal services at the February

2006 spoliation hearing by failing to offer an adequate defense to the claim that Plaintiffs'

intentionally destroyed documents.  Pls.' Mem. in Supp. at 2.  Plaintiffs identify several errors in

this respect.

### (i)  *Defendants' Failure to Offer Archival Websites into Evidence*

Plaintiffs' expert, Michelen, asserts that "a default judgment should only be imposed if

material is irretrievably lost and cannot be replaced or re-created."  Michelen Rep. at 9–10.

Plaintiffs therefore argue that Defendants could have "likely prevented the entry of default

judgment" by offering evidence of what the IQS websites looked like during the relevant periods

at issue.  *Id.* at 10.  To do this, Plaintiffs contend, Defendants would have only needed to retrieve

IQS's webpages from archives.org, a website that provides a snapshot of how a website looked

at a specific point in time.  This line of reasoning fails for several reasons.

First, although Michelen does not explain the relevance of obtaining snapshots of the IQS

website, the presumption appears to be that snapshots of the website itself would somehow act as

a stand in for the spoliated documents.  Judge Owen concluded that the documents removed from

IQS's files prior to the August 2003 production were not snapshots of the IQS website, but

rather:

> 1) documents relating to the creation of IQS's vertical websites in
> 2001 and early 2002, including, but not limited to, the copying of
> the [Thomas Register's] online information for inclusion on IQS's
> websites; 2) documents relating to IQS's unauthorized use of [the
> Thomas Register's] selling aids, including, but not limited to,
> Thom[A]ds:, Thomas's Prospecting CD, and Who's Who in the TR
> Sales Force; (3) documents that contained instructions concerning
> the  .  .  .  cleansing of IQS's vertical websites; (4) documents
> reflecting  the  re-ranking  of  IQS's  advertisers  based  upon

information obtained from [the Thomas Register's] sources; and (5) IQS internal memoranda and correspondence concerning any of the foregoing."

Owen Findings at 7, ¶ 35 (internal quotation marks omitted).

As Defendants note, an archive of the IQS website cannot serve as a substitute for the spoliated documents because the destroyed information demonstrates Plaintiffs' "own copying of the [Thomas Plaintiffs' proprietary] materials." Defs.' Mem. in Opp. at 15. In short, the spoliated documents are different in kind from an archival snapshot of the IQS website because they are *proof* of Plaintiffs' copying and misappropriation and not just the *end product* of Plaintiffs' piracy. Rather than reflecting what the IQS website looked like at a particular point in time, the spoliated documents included Thomas Publishing's misappropriated, confidential information, and copies of the Thomas Register—both of which were allegedly plagiarized in creating IQS's website—as well as memoranda describing how those documents were to be used. *See* Spoliation Tr. at 144:10 – 145:13 (Meiresonne conceding at the spoliation hearing that comparison of IQS's website with the text of the Thomas Register would not allow Thomas to prove "what" Terryn copied). The spoliated documents therefore demonstrate Plaintiffs' possession and use of information obtained from Thomas to create the IQS website.

In this connection, Judge Owen concluded that the spoliated material was not only relevant and favorable to Thomas, but "*necessary* to prove their central allegations," namely, that Plaintiffs copied the Thomas Register, and unlawfully misappropriated Thomas's confidential information. Owen Findings at 11–12, ¶ 19 (emphasis added). Accordingly, the Court concludes that Defendants were not negligent in failing to offer the archival websites as alternate evidence and therefore denies summary judgment to Plaintiffs, and grants summary judgment to Defendants on this issue.

### *(ii) Plaintiffs' Remaining Claims*

Plaintiffs also assert that numerous other actions by Defendants were negligent. These claims include that Defendants: (1) failed to effectively argue that most documents were destroyed prior to the cease-and-desist letter; (2) erroneously stipulated to facts without first consulting Meiresonne; (3) improperly recommended that Meiresonne waive attorney-client privilege with respect to advice given in connection with the 2003 document discovery; (4) failed to effectively undermine Terryn's credibility at the spoliation hearing; (5) failed to effectively explain Meiresonne's apparent shift in testimony; and (6) erroneously produced IQS's Parker Report. *See* Compl. ¶ 57; Defs.' Mem. in Supp. at 22–23. Each of these claims is without merit as they are either entirely irrelevant or merely "second guess" counsel's trial strategy. *See In re Gibson & Cushman Dredging Corp.*, 225 B.R. 543, 548 (Bankr. E.D.N.Y. 1998) ("Allegations that do no more than "second guess" the attorney's strategy are not sufficient.).

Defendants' failure to argue that documents were destroyed prior to the cease-and-desist letter is irrelevant because Meiresonne admitted to destroying documents *after* the cease-and-desist letter was issued, and Judge Owen's findings were predicated on the post-letter destruction. *See* Owen Findings at 9, ¶¶ 7–8; Spoliation Tr. 142–44; Compl. ¶ 57(f). Similarly, as Defendants note, and Plaintiffs do not controvert, the stipulation to facts was to the first six paragraphs of what would become Judge Owen's Findings. *See* Defs.' Mem. in Supp. at 23; Spoliation Tr. 24–25. These paragraphs are a recitation of basic background information that has no bearing on the harm alleged here, *see* Owen Findings at 1–3, ¶¶ 1–6, and Plaintiffs offer no explanation as to how this stipulation, or any other, injured them.

With respect to the waiver of privilege, Defendants assert that they made the strategic decision to advise Meiresonne to testify as to his privileged conversations with counsel regarding

their preparation for the 2003 document production.  *See* Defs.' Mem. in Supp. at 21–22; Miller

Declaration in Support of Summary Judgment ("Miller Decl."), Doc. 65 Attach. 7 ¶ 13.  This

decision was reasonable because the testimony was offered as evidence that Plaintiffs did not

intentionally spoliate evidence in 2003 and because Judge Owen warned that a negative

inference could be drawn from Meiresonne's refusal to testify on that issue.  *See Id.*; Spoliation

Tr. at 180:22–181:23.  Plaintiffs' assertion amounts to nothing more than "second guessing"

counsel's trial strategy and is not sufficient to sustain a claim of attorney malpractice.  *See In re

Gibson & Cushman Dredging Corp.*, 225 B.R. at 548.

Likewise, contrary to Plaintiffs' assertion, Defendants' attempt to undermine Terryn's

credibility at the spoliation hearing was reasonable.  Defendants made the reasoned decision not

to offer Terryn as a witness and then attempted to keep Terryn's deposition testimony from being

read into the record at the spoliation hearing, but were overruled by Judge Owen.  Spoliation Tr.

at 26:6–67:25.  Defendants then read into the record excerpts of Terryn's deposition testimony

that arguably showed that Terryn lacked credibility by reason of:  (1) his agreement with counsel

for the Thomas Plaintiffs to represent him in any legal action resulting from his deposition

testimony, *id.* at 69:9–24; (2) his imprecise recollection of conversations with IQS staff

regarding IQS's website maintenance practices, *id.* at 74:16–79:80; and (3) inconsistencies in the

number of websites Terryn claimed to have created in the short period of time he worked for

IQS, *id.* at 368–370.  Notably, Plaintiffs do not indicate what more Defendants could have done

to attack Terryn's credibility.  The fact that Judge Owen credited Terryn, is not evidence that

counsel was negligent.

With respect to Defendants' alleged failure to explain Meiresonne's apparent shift in

testimony, Meiresonne was afforded an opportunity to explain the inconsistencies between his

June 2002 affidavit and his October 2003 deposition testimony. That testimony, however, was found incredible. Owen Findings at 5, ¶ 22; Spoliation Tr. at 162:10 (Judge Owen noting that Meiresonne's testimony left him "distressed"). Meiresonne asserts that Defendants should have explained that he changed his October 2003 deposition testimony after learning the results of the Parker Report, which showed significant portions of IQS's website had been copied from the Thomas Register. *See* Meiresonne Aff. ¶¶ 130–32. This claim is curious for two reasons. First, if it is true that the reason for the shift in his testimony was the Parker Report, Meiresonne could simply have so stated during the extensive cross-examination he was subjected to on this very topic, including by Judge Owen. *See* Spoliation Tr. at 156:1–165:24. Second, this claim directly contradicts Plaintiffs' claim, discussed immediately below, that Defendants were negligent for having produced the Parker Report in the first place. In any event, this claim "alleges 'no more than an error of judgment,'" and therefore does not rise to the level of malpractice. *Farrell Family Ventures, LLC v. Sekas & Assocs., LLC*, 863 F. Supp. 2d 324, 330 (S.D.N.Y. 2012) (quoting *Rosner v. Paley*, 65 N.Y.2d 736, 738 (1985).

Finally, the Court rejects Plaintiffs' claim that Defendants were negligent in producing and relying on the Parker Report. Defendants assert that they made a strategic decision to produce this document because it showed IQS engaged in "less copying than [Thomas'] equivalent study." Defs.' Mem. in Supp. at 21. Again, Plaintiffs' allege "'no more than an error of judgment,'" and their claim is therefore rejected. *Farrell Family Ventures, LLC v. Sekas & Assocs., LLC*, 863 F. Supp. 2d 324, 330 (S.D.N.Y. 2012) (quoting *Rosner v. Paley*, 65 N.Y.2d 736, 738 (1985).[11]

---

[11] Plaintiffs appear to have abandoned a claim for malpractice based on Defendants' alleged failure to establish the "irrelevancy of 'Project Ajax.'" Compl. ¶ 57(d). Judge Owen concluded that this project "was implemented by IQS to 'purify' the contents of IQS's websites by, *e.g.*, removing links to Thomas websites," Owen Findings at 8, ¶ 39,

In sum, with respect to the discovery issues, both sides have failed to establish that there are no genuine issues of material fact with respect to whether Defendants acted negligently in connection with issuing a litigation hold or overseeing discovery in 2003. Their cross-motions for summary judgment are therefore denied. With respect to the 2006 spoliation hearing, Plaintiffs: (1) have failed to establish that the archival websites could have served as a substitute for the destroyed documents, and have therefore failed to show Defendants were negligent, and (2) raise irrelevant objections or merely second guess counsel's reasonable trial strategy. Their claims with respect to the 2006 spoliation hearing therefore fail as a matter of law. Accordingly, Plaintiffs' motion for partial summary judgment on their malpractice claim is denied, and Defendants' motion for summary judgment is granted with respect to claims of malpractice stemming from the 2006 spoliation hearing that fail as a matter of law. [12]

---

while Plaintiffs' contend that the project was an effort to remove non-paying companies from the IQS website, Compl. ¶ 57(d). Because Plaintiffs provide no factual basis for this claim in their 56.1 Statement (nor do they argue for it in their briefs in support or opposition to summary judgment), were Plaintiffs still pressing this claim, it would fail.

[12] Plaintiffs' claim that "[t]he harm created by counsel's failures on the spoliation issue is that [Thomas were] awarded a default judgment on the liability issue and then [were] able to extract a $2.5 Million settlement on what was otherwise a very defensible copyright/trade secret infringement case" and that "IQS also lost the right to bring a counterclaim against [Thomas]." Michelen Report at 7. In so arguing, Michelen invite the Court to rule on the propriety of the sanctions imposed by Judge Owen. Indeed, Michelen expends considerable space arguing the merits of the "underlying copyright claim," and the counterclaims they would have advanced had their motions not been stricken. Michelen Rep. B–D, at 5–15. The merits of the underlying copyright suit are not before this Court and it will not decide them. Moreover, Plaintiff's may not now assert claims for attorney negligence with respect to the negotiations for the $2.5 million settlement and Defendants' alleged failure to negotiate vacatur of the default judgment as part of that settlement. As Defendants correctly note, *see* Defs.' Opp. at 14, and Plaintiffs have not rebutted, these claims were not raised in Plaintiffs' complaint, *see* Compl. ¶¶ 69–109, and it is inappropriate to raise these new theories of negligence and recovery on summary judgement, *see* Michelen Rep. B(4)–C, at 12–14 (arguing that Defendants should have obtained vacatur of the default judgment as part of the settlement, and that Plaintiffs' statutory damages were limited to $150,000, thereby undermining the appropriateness of the settlement they obtained); *George v. Reisdorf Bros.*, 410 F. App'x 382, 384 (2d Cir. 2011) ("The district court's refusal to consider this claim, raised for the first time in the plaintiffs' papers opposing the defendant's motion for summary judgment, was not an abuse of discretion."); *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir.2006) (refusing to reach merits of claim raised in the plaintiffs' opposition to summary judgment).

### 2. Causation

Relying on the fact that Judge Owen based his entry of default judgment in part on a finding that in 2001 Plaintiffs engaged in copyright infringement and destroyed documents, Defendants contend that that they are entitled to summary judgment because Plaintiffs cannot show that Defendants' acts or omissions in 2003 caused their damages. Defs.' Mem. in Opp. at 16–18; Defs.' Mem. in Supp. at 6–10; *See Rubens*, 527 F.3d at 255 (noting that, to prevail on summary judgment, defendant must establish that the plaintiff cannot prove at least one of the essential elements of its claim). In Defendants' view, it is pure speculation to argue that Judge Owen's decision would have been different if they had advised IQS not to destroy documents in 2003. Defs.' Mem. in Supp. at 9–11. But viewing the facts in the light most favorable to Plaintiffs, as the Court must, the Court finds that Defendants have failed to meet their burden on summary judgment. *Brod*, 653 F.3d at 164 (noting that in deciding a motion for summary judgment, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.") (internal quotation marks omitted).

The fact that Judge Owen's entry of default judgment was premised, in part, on a finding that Plaintiffs destroyed documents in 2001 does not mean that those findings alone were sufficient for the entry of default judgment. Indeed, Judge Owen expressly relied on the spoliation of evidence in 2001 *and* 2003 as the basis for his entry of default judgment. *See* Owen Findings at 9–10, ¶¶ 7–8 (noting that Plaintiffs "had a duty to preserve . . . materials" destroyed in 2001, and "indisputably had a duty to preserve the documents destroyed in July 2003"), at 11 ¶ 18 (relying on the testimony of Terryn, with respect to 2001 destruction of evidence, and Korthals with respect to 2003 destruction, to conclude that the spoliated materials were relevant).

Moreover, because the destroyed materials contained considerable overlap (both sets of destroyed documents contained the sources that had been used to create the IQS website, as well as internal memoranda about how those materials were used by Plaintiffs, Owen Findings at 6 ¶ 24, at 7 ¶ 35; Meiresonne Aff. ¶ 141(d)), it is quite possible that if the documents destroyed in 2003 had been preserved they could have mitigated the prejudice to Thomas that was, in substantial part, the basis for the entry of default judgement.  *See* Owen Findings at 10–12; *see also S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 146 (2d Cir. 2010) (noting that "compensa[ting] the party that has been wronged" is one of the purposes of civil sanctions); *cf. Turner*, 142 F.R.D. at 74 (noting that the remedial rationale for imposing discovery sanctions is based on the notion that, "where evidence is destroyed, the court should restore the prejudiced party to the same position with respect to its ability to prove its case that it would have held if there had been no spoliation.") (internal quotation marks omitted).  In other words, IQS could have argued that documents in its possession in 2003 were the functional equivalent of the documents destroyed in 2001, thus obviating the need for a default judgment and allowing the case to be tried on the merits.

Under these circumstances, a reasonable fact finder could conclude that a reasonable fact-finder in the underlying suit would have imposed a sanction short of default judgement against Plaintiffs had there been only one instance of spoliation.  *See Rubens*, 527 F.3d at 254–55; *Diamond*, 468 F. Supp. 2d at 633 (recognizing that the Court must put itself "in the shoes of the reasonable factfinder in the underlying suit and determine if the result there would have been different absent the alleged malpractice").

Defendants nonetheless contend that Plaintiffs' causation claim is speculative.  In support of this contention, they rely on cases purportedly standing for the proposition that a party cannot

rely on speculative assertions to satisfy the "but for" causation prong of a malpractice claim. Defs.' Mem. in Supp. at 7. These cases are inapposite. In *AmBase Corporation v. Davis Polk & Wardwell*, the court affirmed the dismissal of a malpractice action where the alleged malpractice turned on an "unsettled" area of law. 8 N.Y.3d 428, 435 (2007). The court therefore concluded that a "speculative assertion" based on an "unsettled or debatable" proposition of law "cannot support a legal malpractice claim." *Id.* Likewise, in *Oberkirch v. Fichinger*, plaintiff claimed that she was damaged because her counsel's delay in prosecuting her claim rendered the default judgment she obtained unenforceable. 35 A.D.3d 558, 560 (2nd Dept. 2006). Because Plaintiff provided no factual predicate or expert opinion to support the claim that the default judgement was in fact unenforceable, the court concluded that the plaintiff's injury was speculative. *Id.* This conclusion flows from the premise that, under New York law, "damages claimed in a legal malpractice action must be actual and ascertainable" and not "speculative and incapable of being proven with any reasonable certainty." *Zarin*, 184 A.D.2d 385, 387–88.

Neither of these cases support the claim that plaintiffs in a malpractice suit must put forth ironclad proof that the result in their case would have been different "but for" counsel's failure. Rather, when it comes to causation, Plaintiffs need only demonstrate "that a reasonable fact-finder could" resolve the case in their favor. *Rubens*, 527 F.3d at 254–55. Plaintiffs' claim that "but for" Defendants' negligent failure to issue a litigation hold and oversee their compliance with discovery they would not have spoliated evidence satisfies that burden. *See* Meiresonne Aff. ¶¶ 100–05, 162; Compl. ¶ 80(k); Michelen Rebuttal Report ("Michelen Reb. Rep."), Doc. 57, Attach. 4 at 3. Because Defendants have not presented admissible evidence establishing that Plaintiffs are unable to prove the but for element of their claim, Defendants' motion for summary

judgment is denied with respect to the 2003 discovery process.[13]  *See Rubens*, 527 F.3d 252,

254–55 (citing *Crawford v. McBride*, 303 A.D.2d 442, 442 (2d Dep't 2003).

### B. Dismissal of Rosado in His Individual Capacity

Defendants contend that Rosado should be dismissed from the case in his individual

capacity because there is no evidence that he was involved in either the 2003 discovery process

or the 2006 spoliation hearing.  *See* Defs.' Mem. in Support at 24 (citing Rosado Declaration in

Support of Defendants' Motion for Summary Judgment ("Rosado Dec."), Doc. 65, Ex. 6, ¶ 6–7.

As Plaintiffs note, this contention—at least with respect to the 2003 discovery process—is

undermined by contrary admissible record evidence.  As an initial matter, Rosado signed the

Retainer Agreement which identified him as "hav[ing] primary responsibility for [Plaintiffs']

representation."  Pls.' 56.1 ¶ 30; Retainer Agreement, Doc. 58, Ex. C at 2; Miller Dep., Doc. 61,

Ex. 2 at 28:17–19; Rosado Dep. at 33:16–25.  And tellingly, in support of Defendants' claim that

they properly discharged their obligation to institute a litigation hold (assuming such obligation

obtained), Rosado avers that he issued an oral litigation hold to Plaintiffs at their January 2003

meeting by advising "Meiresonne to retain all documents in his possession and not 'do anything'

with his documents without speaking to [Rosado's] office first."  Rosado Opp. Dec. ¶ 7.

Defendants cannot simultaneously claim that Rosado played no role in the Thomas Action while

relying on Rosado's testimony to support their claim that they properly discharged their legal

---

[13] The Court rejects Defendants' assertion that Plaintiffs' "deliberate destruction of documents in 2003 . . . acts to break the chain of causation for a claim of negligent advice."  Defs.' Mem. in Supp. at 11.  Defendants' claim assumes their advice preceded Plaintiffs' destruction of evidence.  However, Plaintiffs claim that Defendants' negligence—that is to say, their failure to properly advise them continued right through their failure to instruct them not to destroy relevant documents.  *See* Meiresonne Aff. ¶¶ 92–95.  Viewed in this way, Plaintiffs' destruction of evidence was contemporaneous with Defendants' failure to advise them and there was no intervening act.  *See Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP*, No. 12 CIV. 9459 PAE, 2013 WL 3357921, at *6 (S.D.N.Y. July 2, 2013), aff'd, 552 F. App'x 79 (2d Cir. 2014) ("it is well-settled that the introduction of new counsel serves as an *intervening* cause in a legal malpractice claim, severing the chain of causation between the negligent actions of an attorney and a plaintiff's injuries") (emphasis added).

obligations. Finally, as noted by Plaintiffs, Rosado acknowledged authoring a March 27, 2003 email in which he informed Plaintiffs that they would "discuss a discovery strategy in the very near future," further casting doubt on Defendants' claim that Rosado had no involvement in the 2003 discovery process. Plaintiffs' Reply Memorandum of Law in Support of their Motion for Summary Judgment ("Pls.' Reply"), Doc. 64 at 12; Rosado Dep. at 36:11–37:25.

At a minimum, there is admissible evidence suggesting that Rosado was involved in the discovery process in 2003. Dismissal from the case is therefore inappropriate.

### C. Breach of Contract Claim

Plaintiff's breach of contract claim must be dismissed, as Defendants urge, as duplicative of Plaintiffs' malpractice claim. *See* Defs.' Mem. in Supp. at 24. Plaintiffs allege that Defendants were contractually obligated "to provide specific competent and professional legal services consistent with the accepted legal norms and practices of the profession" and breached this obligation by failing to properly oversee and advise Plaintiffs in connection with discovery. Compl. ¶¶ 112–14. However, "when the alleged breach of a retainer agreement is a 'breach of general professional standards' and not a breach of a particular action or promised result, then the breach of contract claim is duplicative of the legal malpractice claim and viewed as a redundant pleading." *PPX Enterprises, Inc. v. Fredericks*, 5 F. App'x 25, 28 (2d Cir. 2001) (quoting *Senise v. Mackasek, et al.*, 227 A.D.2d 184, 185 (1st Dep't 1996)); *see also Diamond v. Sokol*, 468 F. Supp. 2d 626, 640 (S.D.N.Y. 2006) (same). Here, although Plaintiffs assert that they are claiming "breach of a particular action or promised result," they point to nothing in the record to support this contention, Pls.' Mem. in Opp. at 16–17, and the Retainer Agreement contains no such promise, s*ee generally* Retainer Agreement. Plaintiffs' breach of contract claim is therefore dismissed as duplicative of their legal malpractice claim.

## IV.     CONCLUSION

For the reasons set forth above, Plaintiffs' motion for partial summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Specifically, Defendants motion for summary judgment is granted with respect to (1) claims of malpractice stemming from Plaintiff's alleged inquiry regarding the destruction of documents in advance of the August 2003 document production, (2) claims of malpractice stemming from the 2006 spoliation hearing, (3) claims of malpractice stemming from the negotiation of the settlement, and (4) the breach of contract claim, and denied in all other respects. The parties are directed to appear for a status conference on **February 1, 2017 at 11:00 A.M.** The Clerks of Court is respectfully directed to terminate the motions, Docs. 25, 56, and 65.

It is SO ORDERED.

Dated: January 2, 2018
      New York, New York

Edgardo Ramos, U.S.D.J.